UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Honorable Sidney B. Brooks

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Bankruptcy Case No. |
| ROLLAND NELSON ELLIS, | ) | 08-24670-SBB |
| SS#xxx-xx-9518 | ) | Chapter 13 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| ROLLAND NELSON ELLIS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. |
| | ) | 10-01013-SBB |
| UNITED STATES DEPARTMENT OF | ) | |
| HOMELAND SECURITY, | ) | |
| Defendant. | ) | |

**APPEARANCES:**

Matt McCune, Esq.
The McCune Law Firm, LLC
426 S. Lincoln Street
Denver, CO 80209
LEAD COUNSEL FOR PLAINTIFF

Stephen E. Berken, Esq.
Law Offices of Stephen E. Berken
1159 Delaware Street
Denver, CO 80203
CO-COUNSEL FOR PLAINTIFF

Juan Villasenor, Esq.
David M. Gaouette, Esq.
United States Attorney
1225 Seventeenth Street, Suite 700
Denver, CO 80202
COUNSEL FOR DEFENDANT

**MEMORANDUM OPINION AND ORDER**

THIS MATTER came before the Court on the trial of Plaintiff's Complaint conducted on February 7 and 8, 2013. The Court, having reviewed the evidence and the within case file, makes the following findings of fact, conclusions of law, and enters the following Order.

I.  **Introduction**

Rolland Nelson Ellis ("Plaintiff") brings this action against the U.S. Department of Homeland Security ("Defendant" or "DHS") asserting that Defendant discriminated against him in violation of 11 U.S.C. § 525(a) by temporarily denying him employment as a government contract security worker.

Defendant contends that it is not the proper defendant in the action and that DECO, Inc. ("DECO"), a contractor with Defendant, is responsible for any improper conduct. Moreover, Defendant asserts that the denial of employment was not "solely" based on the Chapter 13 bankruptcy of Plaintiff.

This case is of particular importance in the post-9/11 era. This is especially true with respect to security staff hiring decisions in federal office buildings. This opinion will discuss fundamental determinations and guidelines with respect to the reach of Section 525(a). Moreover, it examines the level of discretion that is permissible by governmental employers in assessing the suitability of a candidate for employment when the issues of security clearance and personal debt serves as a threat to the position of trust placed in an employment candidate.

The Court herein finds that, under the facts and circumstances of this case, Defendant did not violate Section 525(a).

II.  **Background**

On October 31, 2008, Defendant awarded DECO a contract ("Contract") to perform armed guard services in and around Denver, Colorado.[1] DECO currently performs services pursuant to the Contract. Under the Statement of Work provisions of the Contract, all personnel performing work under the Contract must pass a suitability determination conducted by Defendant.[2] Contractor personnel are not permitted to perform under the Contract until appropriate suitability determinations have been made.

Section 17.3A of the Statement of Work provides, in relevant part:

> DHS shall have and exercise full control over granting, denying, withholding or terminating unescorted access to a Government facility and or sensitive Government information access for Contractor employees, based upon the results of a background investigation. DHS may, as it deems appropriate, authorize and make favorable entry on duty (EOD) decision [sic] based on preliminary security checks. The favorable EOD decision would allow the employees to commence work temporarily prior to the completion of the full investigation. The granting of a favorable EOD decision shall not be considered as assurance that a full employment suitability authorization will follow as a result

2

> thereof. The granting of a favorable EOD decision or a full employment suitability determination shall in no way prevent, preclude, or bar the withdrawal or termination of any such access by DHS, at any time during the term of the Contract.[3]

DECO, as the contractor, must ensure that its employees receive a formal suitability determination by the Federal Protective Service ("FPS"), and such determinations must be made in accordance with 5 C.F.R. § 731.202.[4]

As part of the suitability determination, contractor employees must submit several forms and other information as specified in the Contract. Section 17.4 of the Statement of Work provides that FPS shall have and exercise "full and complete control over granting, denying, withholding, or terminating suitability clearances for [contractor] employees."[5]

At all relevant times,[6] Plaintiff was employed with DECO as a security guard. DHS Instruction Handbook 121-101-007, Chapter 3, provides, in relevant part, that "moderate risk" positions "have the potential for moderate to serious impact on the integrity and efficiency of Federal service. These positions involve duties that are important to the agency or program mission with significant program responsibility or delivery or service."[7] Defendant has designated Plaintiff's armed security guard position as a Moderate Risk Public Trust Position under 5 C.F.R. § 731.106(b), and requires a successful suitability determination therefrom.[8]

On March 10, 2009, Jerry Williams, Defendant's Chief Security Officer, modified the "bad debt threshold" standard to be used in background investigations for all of Defendant's employees and contractors by way of a memorandum issued to DHS Component Chief Security Officers.[9] Mr. Williams, by and through his directive in the memorandum, set a bad debt threshold "of $7,500.00 for all employees/applicants and $1,500.00 for all individuals requesting [top secret] SCI access."[10] "Bad debt," according to the memorandum, means:

> any delinquent debt 120 days past due; however, certain types of indebtedness, regardless of the amount, will be treated as suitability or security concerns in every situation and **must** be satisfactorily resolved before an affirmative adjudicative decision is made. These are bankruptcies, court-imposed judgments; liens; Federal [sic] debts; defaulted student loans; delinquent child support payments; and delinquent Federal [sic], State [sic], or local taxes.[11]

As part of the forms that Plaintiff submitted for his background investigation, Plaintiff executed an Authorization for Release of Information; Plaintiff also executed a Disclosure and Authorization Pertaining to Consumer Reports Pursuant to the Fair Credit Reporting Act. On April 4, 2009, FPS made a preliminary suitability decision of "favorable" regarding Plaintiff's background investigation.

3

On August 28, 2009, Clayton Porter, an FPS personnel security specialist ("Mr. Porter"), notified Plaintiff that during his suitability determination his credit summary report indicated that he owed many debts to various creditors that appeared to be unpaid ("August 28, 2009 Letter").[12] Mr. Porter requested that Plaintiff review the credit summary report and "provide all documents showing payment completion or debt resolution in each of these cases." Mr. Porter gave Plaintiff until **September 17, 2009**, to provide the information. Based on the credit summary report, there was $47,837.00 of debt for Plaintiff to mitigate or resolve.

On September 3, 2009, Plaintiff sent a letter to Mr. Porter, which stated:

> I am under Federal Bankruptcy Protection for 5 years as per my Chapter 13. I am current with the U.S. Bankruptcy Court at this time. I don't understand your issue with my Chapter 13. These issues you have raised on my credit report are under Chapter 13. If you have issues I have not explained, please contact my Bankruptcy Attorney, Matt McCune . . . . I hope this has been helpful.[13]

Plaintiff did not then summit any further documents or information.

On September 10, 2009, FPS reached an unfavorable determination on Plaintiff's background investigation, stating in a memorandum that he "is not acceptable for employment under a government contract," a decision that was reached based on a review of records supplied to FPS.[14] Curiously, this memorandum was presented to Plaintiff prior to the expiration of the September 17, 2009, deadline set by way of the August 28, 2009 Letter. The memorandum advised Plaintiff of his appeal rights.

On September 17, 2009, Plaintiff appealed FPS's unsuitability determination. On January 25, 2010, following a request by Defendant, Plaintiff's counsel provided his payment records from the Chapter 13 Trustee's payment log regarding his bankruptcy.

Three days later, on January 28, 2010, FPS responded to Plaintiff's appeal regarding his unfavorable suitability determination. FPS notified Plaintiff that the initial finding of unsuitability was overturned. To reach this decision, FPS reviewed information in Plaintiff's "case file, facts gathered from various sources and *additional information provided by [his] attorney*."

On February 1, 2010, FPS notified Mr. Porter that as a result of Plaintiff's appeal, his suitability adjudication was favorable, and stated that he "may be reinstated to a position as a government contract guard if it is so desired by the company."

4

### III. Defendant's Rule 52(c) Oral Motion

At the close of Plaintiff's case in the trial before this Court, Defendant orally requested a judgment on partial findings pursuant to Fed. R. Civ. P. 52(c).[15] Defendant asserted that Plaintiff had not made a prima facie case as to his claim under 11 U.S.C. § 525(a).

First, Defendant contended that it was not the employer in the case. Instead, Defendant urged the Court that it was DECO, the non-governmental contractor, who provided security services for and on behalf of the government and that DECO was the employer and exclusive party, if any, liable to Plaintiff for the alleged wrongs.

Second, Defendant argued that the finding of unsuitability was caused by various factors and not just Plaintiff filing for bankruptcy. Defendant maintained these additional factors included: (1) Mr. Porter's confusion, or lack of understanding, of bankruptcy law, (2) that Defendant granted a preliminary interim suitability status to Plaintiff pending submission of additional information and requested documentation, and (3) that Plaintiff failed to supply and submit additional information or further supporting documentation and that was the proximate cause, or the triggering event, in the finding of unsuitability.

The Court declined to rule conclusively on the foregoing arguments and render judgment at the close of all evidence. Because the case is fully submitted and the Court is making findings on the Fed. R. Civ. P. 52(a) arguments, the Court partially denies Defendant's Rule 52(c) Motion as to these arguments as they are moot.

Third and last, Defendant alleged that Plaintiff had no license to revoke. Plaintiff conceded this point at trial. The Court, acknowledging Plaintiff's concession and having the benefit of the first day of trial, granted this part of Defendant's Rule 52(c) Motion, holding no license was denied or revoked, or otherwise affected, by the finding of unsuitability.

### IV. Jurisdiction

The Court concludes that only one claim remained at the time of trial. The initial Complaint sought three claims for relief. The First Claim for Relief sought relief for violation of 11 U.S.C. § 525(a). This is the claim before the Court at trial. The Court has jurisdiction over this claim for relief pursuant to 28 U.S.C. § 1334(b) and this is a core proceeding consistent with 28 U.S.C. §§ 157(a), (b)(1), and (b)(2)(A).

The Second Claim for Relief for violation of 42 U.S.C. § 1983 has been abandoned by Plaintiff. The Court would further conclude that, with respect to the Second Claim for Relief, the jurisdiction of the Court was tenuous as the relief sought was not a core proceeding and it was, at best, a "related to" matter under 11 U.S.C. § 157(c).[16]

The Third Claim for Relief for injunctive relief under 11 U.S.C. § 105(a) was also abandoned by Plaintiff, but the Court would also find that this claim for relief is otherwise moot as Defendant reinstated Plaintiff's employment prior to the trial.

V.     **Discussion**

   A.     **Burden of Proof**

The burden of proof in adversary proceedings brought under 11 U.S.C. § 525(a) is initially on the debtor to show that a governmental unit has violated Section 525(a).[17] Specifically, here, Plaintiff must show: (1) that Defendant is a governmental unit; (2) that Defendant denied, revoked, suspended or refused to renew a license, permit, charter, franchise or other similar grant with respect to employment of or termination of the employment of or discrimination with respect to employment against (3) a person that is a Debtor under the Bankruptcy Code, (4) *solely because* such Debtor is a debtor under the Bankruptcy Code, or has been insolvent before the commencement of the case, or has failed to pay a dischargeable debt prior to entry of Debtor's discharge.[18]

Once a debtor has shown that he/she has been denied a governmental benefit for which he/she was qualified, the debtor has been found to have made a prima facie case for relief under Section 525(a).[19] The burden then falls to the governmental unit taking the adverse action to articulate a legitimate, non-discriminatory reason for its adverse action in order to prevail.

   B.     **Discriminatory Treatment under 11 U.S.C. § 525(a)**

11 U.S.C. § 525 provides:

> (a)     Except as provided in the Perishable Agricultural Commodities Act, 1930, the Packers and Stockyards Act, 1921, and section 1 of the Act entitled "An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes," approved July 12, 1943, **a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated,** *solely* **because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case**

6

> but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.[20]

Defendant challenges—and this case revolves around—the interpretation of two elements of Section 525(a), namely, whether Defendant's actions were *solely because* of Plaintiff's bankruptcy and dischargeable debts, and whether the true defendant in this case is a governmental unit.

    1.    <u>Interpreting "Solely Because"</u>

The interpretation of the phrase *solely because* is not without definition. The U.S. Supreme Court in *FCC v. NextWave Personal Communications, Inc. (NextWave)*[21] strengthened the protection afforded to debtors by Section 525(a) by broadly interpreting the phrase.[22] *NextWave* involved a dispute regarding the cancellation of a license issued by the FCC to NextWave Personal Communications, Inc. The license was cancelled after the company filed for Chapter 11 protection and suspended payments to all creditors including the FCC. Notwithstanding an extensive and complex procedural history, the Supreme Court granted certiorari to address whether Section 525(a) was violated. One of three arguments made by the FCC was that it had not cancelled the license solely because of nonpayment, but rather it had a valid regulatory motive for the cancellation of the license.

In rejecting the FCC's argument, the Supreme Court defined solely because as "mean[ing] nothing more or less than that the failure to pay a dischargeable debt must alone be the *proximate cause* of the cancellation."[23] The Supreme Court explained that it is "the act or event that triggers . . . the decision to cancel" no matter what the "ultimate motive in pulling the trigger may be."[24]

The Supreme Court's interpretation of this phrase is consistent with the legislative history of Section 525(a).[25] Congress sought to attack discriminatory practices by government entities that would prevent a debtor from taking advantage of the opportunities afforded by federal bankruptcy laws.[26] As the Supreme Court mentioned in *NextWave*, when the statute refers to a failure to pay a debt as the sole cause of cancellation (solely because), other causes that may exist do not preclude application of the prohibition as that reading would render Section 525(a) of all force.[27]

Accordingly, in evaluating whether a violation of Section 525(a) has occurred, the Court should examine whether the bankruptcy filing and/or failure to pay a debt was the proximate cause of the government's action—the determination that Plaintiff was unsuitable for clearance—against Plaintiff. In evaluating Defendant's actions, the Court must look to the objective evidence and draw reasonable inferences as to the subjective intent of the parties involved.[28]

2. <u>Governmental Unit: Is the Defendant the Proper Defendant in this Action?</u>

Defendant does not dispute that it is a governmental unit consistent with 11 U.S.C. § 101(27). However, one of Defendant's key defenses is that it is not the actual employer of Plaintiff because DECO maintained that role.

There is no authority that suggests a plaintiff must be employed by the government to bring a Section 525(a) claim against the government. A plain reading of the statute and relevant case law makes it clear that no such requirement exists.[29]

Defendant's argument that only DECO can be held responsible for violation of Section 525(a) fails because it appears that Defendant made the unsuitability determination and DECO had no other option but to decline employment to Plaintiff. That is, once Defendant found Plaintiff to be unsuitable for employment on a government Contract, DECO had no choice but to pull Plaintiff from that Contract, which required a favorable suitability determination from Defendant.

During the trial, argument was made and Mr. Porter testified that DECO could employ Plaintiff notwithstanding the unsuitable determination. The Court is cognizant that DECO could have employed Plaintiff in a non-government security position, but that is unrealistic and was impossible. DECO had no such non-governmental position available. The evidence demonstrates that Defendant made the determination that Plaintiff was unsuitable for employment and this effectively precluded DECO from employing Plaintiff. The Court concludes that Defendant is the proper defendant in this action.

C. **Sovereign Immunity**

The doctrine of sovereign immunity forbids suits against the Unites States by government bodies and private individuals.[30] It is well settled, however, that Congress has the exclusive authority to waive federal sovereign immunity.[31] Congressional waiver is valid only if a statute provides "a clear statement from the United States waiving sovereign immunity" in terms that are "unequivocally expressed."[32]

In 11 U.S.C. § 106, Congress unequivocally and expressly codified its waiver of sovereign immunity with respect to certain enumerated provisions in the Bankruptcy Code— including Section 525.[33] Prior to the 1994 amendments to the Bankruptcy Code, the U.S. Supreme Court in *Nordic Village, Inc.*, interpreted Section 106 as a waiver of federal sovereign immunity as to injunctive and declaratory relief, but not monetary relief.[34] In response to the *Nordic Village., Inc.* decision, Congress amended Section 106 and made clear that the sovereign immunity abrogated in Section 106 is to include money judgments.[35] Section 106 has generally remained unchanged since the 1994 amendments.

8

In relevant part, Section 106 provides:

> (a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:
>
> (1) Section[ ] . . . 525 . . . of this title.
>
> (2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units . . . .[36]

The Tenth Circuit, interpreting legislative history around the adoption of Section 106, has held "that Congress intended § 106 to provide a *limited* waiver of sovereign immunity to enable a debtor to recover damages only to the same extent that the debtor's claim would be cognizable outside of bankruptcy."[37] Defendant contends that because Section 106 constitutes a limited waiver of sovereign immunity, it must be construed, in terms of its scope, in favor of Defendant as applied to Section 525. Defendant avers that for the Court to conclude that a claim pursuant to Section 525(a) applies to a non-employer governmental unit, the Court would have to determine Congress unequivocally expressed such result. In support of this averment, Defendant cites to *In re Franklin Savings Corp.*, a Tenth Circuit case in which the court refused to construe Section 106 as invalidating a statute of limitation provision in a federal tort statute.[38]

If the Court were to accept Defendant's argument, in that Section 525(a)—narrowly construed—does not apply to DECO, it does not change that fact that Defendant's sovereign immunity is still waived as to Section 525(a) liability. As outlined, Section 106 expressly and unequivocally waives Defendant's sovereign immunity from claims under Section 525(a). Defendant, here, in an attempt to escape an express waiver of its sovereign immunity, is artfully hiding behind DECO to allow it to claim that Section 525(a) does not apply on the facts. As discussed, *supra*, although DECO may facially be a non-governmental unit, the alleged injury in this case emanated from Defendant's actions, and DECO's presence was merely that of a pass-through or a middle man.

Accordingly, contrary to Defendant's assertion, the Court may examine Defendant's liability under Section 525(a). This finding is consistent with Tenth Circuit jurisprudence, which demands a narrow interpretation of Section 106, as the facts of the case do not require the Court to reach a conclusion based on an expanded reading of Section 525(a). Section 525(a) applies to Defendant because of its actions with Plaintiff through its relationship with DECO, not because the Court has read in liability for non-employer governmental units under Section 525(a). Therefore, the Court concludes that Defendant's sovereign immunity argument fails and its liability should be considered pursuant to Section 525(a).

D.  **Analysis of Defendant's Bad Debt Policy**

1.  <u>Practice and Policy of Defendant is not in Violation of Section 525(a)</u>

Plaintiff argues that Defendant's revised bad debt threshold policy (the "Policy") is a facial violation of Section 525(a) as the Policy specifically identifies "bankruptcies" as "suitability or security concerns" that must be "satisfactorily resolved" before an affirmative suitability determination can be made. Plaintiff has correctly pointed to the two operative phrases in the Policy that must be interpreted to determine whether the Policy is in violation of Section 525(a). Each of the phrases will be discussed in turn.

First, the Policy defines certain types of indebtedness, including debts in bankruptcies, as "suitability or security *concerns*"[39] that must be satisfactorily resolved before an affirmative suitability determination. In constructing the Policy, Mr. Williams carefully deferred to the word "concerns," which functions to provide guidance and direction to the security officers applying the Policy to inquire further into the nature and the status of certain debts. What this phrase does not do, as Plaintiff contends, is create a presumption, and certainly not an irrebuttable presumption, that the employee is unsuitable. Instead, the Policy provides the latitude to both the security officer performing the determination and the employee, to mitigate such concerns by resolving them through further inquiry. Essentially, the construction of the phrase simply shifts the burden to the employee under examination, requiring the employee to provide appropriate documentation—that would not ordinarily be available to the security officer—to remedy certain bad debt concerns.

Second, the Policy stipulates that the concerns previously discussed must be "satisfactorily resolved" before an affirmative suitability decision. The Policy does not define how, and to what extent, an employee's response will satisfactorily resolve a particular concern. The meaning of this phrase is especially important to the determination of the Policy's legality pursuant to Section 525(a). For instance, if the employee can only satisfactorily resolve a debt concern by a showing that the debt is completely satisfied, then the Policy likely stands in violation of Section 525(a). However, if the phrase simply requires the employee to document its standing in bankruptcy and show that the employee is compliant with any bankruptcy plan, then no violation of Section 525(a) would exist. Accordingly, because of the vague meaning of "satisfactorily resolve[ ]," the Court looks to Defendant's application of the Policy to define the underlying definition of the phrase.

During trial, Defendant provided three instances similar to the within instance with Plaintiff where FPS questioned a guard's suitability due to bad debts as defined by the Policy. In the first instance, while conducting a suitability determination, Mr. Porter found a guard to have unresolved bad debts and notified the guard of the concerns. Within the time prescribed by Mr. Porter, the guard promptly informed Mr. Porter of his/her pending Chapter 13 bankruptcy case. In the guard's response, the guard provided his/her bankruptcy filing and cross-referenced the bad debts raised in the suitability determination with the filing. Upon receipt, Mr. Porter determined the bad debt concerns were satisfactorily resolved and immediately made a favorable

10

suitability finding. Similarly, in two other instances, Mr. Porter raised bad debt concerns with guards similarly situated. In each of the cases, as soon as the guards provided documentation (each included their respective bankruptcy plans) confirming that the bad debts were part of a bankruptcy case and that the guards were compliant with their bankruptcy plan, the guards were given a favorable suitability finding.

As depicted by the limited showing of FPS's application of the Policy, "satisfactorily resolved"—with respect to debts in bankruptcy—seems only to require the employee to provide documentation of bankruptcy, including confirmation that the bad debt concerns are included in the bankruptcy plan and that the employee is compliant with the bankruptcy procedures. Such application is consistent with Section 525(a) in that once confirmation is provided that the debt concerns are associated with bankruptcy, the governmental unit confirms the suitability of the employee. Based on the foregoing, the Court holds that the Policy does not facially violate Section 525(a)'s protection against discriminatory treatment due to a bankruptcy filing.

2. <u>Defendant did not Illegally Discriminate against Plaintiff's Right to Employment</u>

The Court having determined that the Policy does not facially violate 11 U.S.C. § 525(a) must now determine whether Defendant's implementation of the Policy as to Plaintiff was contrary to the protection afforded by Section 525(a). In order to prevail on a Section 525(a) claim, Plaintiff must show that his failure to pay a debt in bankruptcy, alone, was the proximate cause of FPS's decision to issue an unfavorable suitability determination.

Plaintiff contends that Mr. Porter illegally found Plaintiff unsuitable because Plaintiff failed to properly show payment completion or debt resolution of debts in Plaintiff's Chapter 13 bankruptcy. However, the question invariably arises whether the unfavorable suitability determination was the product of the underlying bad debts, or Plaintiff's failure to adequately mitigate the bad debt concerns by providing evidence that the debts were in his bankruptcy plan. If the evidence shows the latter, then the debts in bankruptcy would not be the sole proximate cause of Plaintiff's unfavorable suitability determination. Instead, the debt concerns would only be "a" cause, along with Plaintiff's failure to adequately produce evidence that the debts were being resolved in Plaintiff's bankruptcy.

On this particular question, what does the record show? First, the record shows that Defendant granted Plaintiff an initial preliminary suitability determination. Accordingly, that shows no predisposition or inclination to decline or disapprove of Plaintiff's employment knowing the existence of Plaintiff's bankruptcy.

Second, in Mr. Porter's letter to Plaintiff informing him of the initial unfavorable suitability determination, Mr. Porter explained:

> Mr. Ellis has had the opportunity, through due process, to submit additional facts, proof, and supporting documents outlining any mitigating circumstances affecting the findings of this review. Mr.

11

> Ellis returned a note to me providing his attorney's information instead of attempting to mitigate any issues.[40]

Third, Mr. Porter made a note to Plaintiff's file on the day the letter was sent that "Mr. Ellis has failed to address <u>any</u> of the issues . . . raised . . . and made no attempt to . . . show[ ] payment agreement or plans with the creditors that he is indebted to."[41] These passages provide a strong showing that Plaintiff's unfavorable suitability was a result of Plaintiff's failure to show that the bad debt concerns were part of his bankruptcy, not because he simply had bad debts.

Stated another way, had Plaintiff complied with Mr. Porter's request, would he still have been found unsuitable? Based on the evidence presented, the Court finds that FPS would have found Plaintiff suitable had Plaintiff presented his Chapter 13 filing showing all of the bad debt concerns were included in Plaintiff's bankruptcy. Plaintiff claims that he informed Mr. Porter of his bankruptcy and even provided his bankruptcy counsel's name and number. However, this information does not reach the evidentiary level required to mitigate the bad debt concerns. As the Court has noted, due to the level of security entrusted to Plaintiff, the government must be provided the latitude to deal with bad debt concerns, which is why Plaintiff was required to provide documented evidence rather than a mere note explaining that he was in bankruptcy. To expect, or to demand, that Mr. Porter undertake to investigate, evaluate, and document the bankruptcy procedure and debt resolution—tasks Plaintiff was to do—is not sufficient to demonstrate that the subject debt was being satisfactorily resolved.

Accordingly, the Court holds that Plaintiff's debts in bankruptcy were not the sole proximate cause of his unfavorable suitability adjudication. Instead, it was a culmination of events that led to Plaintiff's unfavorable suitability adjudication, including Plaintiff's failure to provide documents that the debt concerns were included in his Chapter 13 bankruptcy.

Lastly, Plaintiff correctly points to the fact that Mr. Porter found Plaintiff unsuitable seven days prior to a deadline in which Mr. Porter himself set. This fact is troublesome to the Court, however, it does not provide evidence of a violation of Section 525(a). At best, such conduct by the government seems to represent a lack of patience, protocol, or courtesy, rather than an act in violation of Section 525(a). Furthermore, it appears that any premature decision by Mr. Porter was correctly resolved upon submission of appropriate documentation and Plaintiff's appeal of Plaintiff's unsuitability determination. Although it may appear that a significant passage of time occurred to the detriment of Plaintiff because of the speed by which Mr. Porter acted, it is not unimportant to note that Plaintiff later found it appropriate to provide a more complete and accurate depiction of, and documentation concerning, his Chapter 13 bankruptcy.[42]

E.  **Plaintiff's Concession of the License**

As discussed in Part III, *supra*, Plaintiff conceded, and the Court ruled, in response to Defendant's Rule 52(c) Motion that there was no license revoked. Arguably, Plaintiff's concession of the license issue disposes of Plaintiff's remaining claim for relief. The First Claim for Relief centers almost exclusively on the alleged revocation of license. Specifically, paragraph 17 and 18 of the Complaint states:

> 17. Defendant, DHS's action violate 11 U.S.C. § 525(a) by revoking his license to do government contract security work.
>
> 18. Debtor has suffered damages in lost wages and severe emotional distress. Debtor has been unable to find replacement income and is at risk of losing his home and being dismissed from the Chapter 13 Bankruptcy. The stress put on the Debtor by DHS's illegal actions have taken a toll on the debtor's physical and emotional well-being.

Consequently, notwithstanding the discussion of Defendant's liability pursuant to Section 525(a), the specific concession by Plaintiff that no license was revoked, likely resulted in the withdrawal or abandonment of the First Claim for Relief. Nevertheless, the Court finds that even if the license component of the claim was withdrawn, the parties tried the Section 525(a) claim by consent consistent with Fed. R. Bankr. P. 7015, as to the denial of employment, termination of employment, or discrimination with respect to employment.

VI.  **Conclusion and Order**

As noted earlier in this Memorandum Opinion and Order, only the First Claim for Relief for violation of 11 U.S.C. § 525(a) remained at the time of the trial of this matter. That is, whether (1) the Policy of the Defendant violated Section 525(a) and/or (2) the actions of Defendant via Mr. Porter violated Section 525(a).

The Court concludes that the Policy of Defendant is not in violation of Section 525(a) because, while the Policy identifies bankruptcy as one of the "suitability or security concerns," such concerns may be easily resolved by demonstrating that the employee is in a performing Chapter 13 plan or obtaining a discharge of unsecured obligations in a Chapter 7 case.

The Court further concludes that, while the actions of Mr. Porter, on behalf of Defendant, did seem abrupt, it appears from the evidence and testimony at trial that Plaintiff did not timely address the issues and provide documentation that would show an attempt to repay his creditors either through bankruptcy, or otherwise resolve the debt concerns of Defendant.

Consequently, the evidence before the Court does not demonstrate that Plaintiff was denied employment "solely because [Plaintiff] is or has been a debtor" under the Bankruptcy

Code. Thus, Plaintiff has not met his burden of proof. Moreover, even if Plaintiff had met his burden, Defendant demonstrated a legitimate, non-discriminatory reason for its adverse action. The evidence reflects that Plaintiff did not address, or timely and effectively respond to, the concerns initially raised by Mr. Porter.

IT IS THEREFORE ORDERED that Defendant's Fed.R.Civ.P. 52(c) oral, renewed motion for judgment on partial findings is GRANTED, IN PART, and DENIED, IN PART, as set forth hereinabove in Section III.

IT IS FURTHER ORDERED and judgment shall enter in favor of Defendant and against Plaintiff as follows:

1. Plaintiff's First Claim for Relief is DENIED.

2. Plaintiff's Second Claim for Relief has been abandoned by Plaintiff and is further DENIED.

3. Plaintiff's Third Claim for Relief has been abandoned by Plaintiff and is further DENIED.

IT IS FURTHER ORDERED that all issues giving rise to the Complaint filed herein having been resolved, the within adversary proceeding may be closed by the Clerk once this Order becomes final and non-appealable.

Dated this 13th day of May, 2013.

BY THE COURT:

*/s/ Sid Brooks*

Sidney B. Brooks,
United States Bankruptcy Judge

---

[1] Defendant's Exhibit D.

[2] *Id.* at 40–46.

[3] *Id.* at 43.

[4] 5 C.F.R. § 731.202 (2013) provides:

> (a) *General.* In determining whether its action will protect the integrity or promote the efficiency of the service, OPM, or an agency to which OPM has delegated authority, shall make its determination on the basis of the specific factors in paragraph (b) of this section, with appropriate consideration given to the additional considerations outlined in paragraph (c) of this section.

(b) *Specific factors.* When making a determination under paragraph (a) of this section, the following may be considered a basis for finding an individual unsuitable:
    (1) Misconduct or negligence in employment;
    (2) Criminal or dishonest conduct;
    (3) Material, intentional false statement or deception or fraud in examination or appointment;
    (4) Refusal to furnish testimony as required by §5.4 of this title;
    (5) Alcohol abuse of a nature and duration which suggests that the applicant or appointee would be prevented from performing the duties of the position in question, or would constitute a direct threat to the property or safety of others;
    (6) Illegal use of narcotics, drugs, or other controlled substances, without evidence of substantial rehabilitation;
    (7) Knowing and willful engagement in acts or activities designed to overthrow the U.S. Government by force;
    (8) Any statutory or regulatory bar which prevents the lawful employment of the person involved in the position in question.

(c) *Additional considerations.* In making a determination under paragraphs (a) and (b) of this section, OPM and agencies shall consider the following additional considerations to the extent they deem them pertinent to the individual case:
    (1) The nature of the position for which the person is applying or in which the person is employed;
    (2) The nature and seriousness of the conduct;
    (3) The circumstances surrounding the conduct;
    (4) The recency of the conduct;
    (5) The age of the person involved at the time of the conduct;
    (6) Contributing societal conditions; and
    (7) The absence or presence of rehabilitation or efforts toward rehabilitation.

[5] Specifically, section 17.4G of the Statement of Work provides:

> If FPS finds a Contract employee to be unsuitable to work as a result of the suitability investigation under the Contract, the Contractor shall be advised immediately that such employee cannot work or be assigned to work under the Contract, and the Contractor shall in turn immediately remove the affected employee from the Contract. The security guard or the Contractor may appeal the suitability determination to the [Contracting Officer]. However, in such cases the Contractor shall proceed with the hiring process at their own risk until the final determination of the security guard's suitability has been accomplished. Under no circumstances shall a Contract employee who has received a notice of unfavorable (unsuitable) adjudication work under this or any FPS security guard service contract.

[6] DECO was preceded by AM-GARD, Inc. as the contracting employee.

[7] Plaintiff's Exhibit 6.

[8] 5 C.F.R. 731.106 provides:

> (a) Risk designation. Agency heads must designate every covered position within the agency at a high, moderate, or low risk level as determined by the position's potential for adverse impact to the efficiency or integrity of the service. OPM will provide an example of a risk designation system for agency use in an OPM issuance as described in Sec. 731.102(c).
>
> (b) Public Trust positions. Positions at the high or moderate risk levels would normally be designated as ``Public Trust" positions. Such positions may involve policy making, major program responsibility, public safety and health, law enforcement duties, fiduciary responsibilities or other duties demanding a significant degree of public trust, and positions involving access to or operation or control of financial records, with a significant risk for causing damage or realizing personal gain.
>
> (c) Investigative requirements.
>
>> (1) Persons receiving an appointment made subject to investigation under this part must undergo a background investigation. OPM is authorized to establish minimum investigative requirements correlating to risk levels. Investigations should be initiated before appointment but no later than 14 calendar days after placement in the position.
>>
>> (2) All positions subject to investigation under this part must also receive a sensitivity designation of Special-Sensitive, Critical-Sensitive, or Noncritical-Sensitive, when appropriate. This designation is complementary to the risk designation, and may have an effect on the position's investigative requirement. Sections 732.201 and 732.202 of this chapter detail the various sensitivity levels and investigative requirements. Procedures for determining investigative requirements for all positions based upon risk and sensitivity will be published in OPM issuances, as described in Sec. Sec. 731.102(c) and 732.201(b).
>>
>> (3) If suitability issues develop prior to the required investigation, OPM or the agency may conduct an investigation sufficient to resolve the issues and support a suitability determination or action, if warranted. If the person is appointed, the minimum level of investigation must be conducted as required by paragraph (c)(1) of this section.
>
> (d) Suitability reinvestigations. Agencies, relying on authorities such as the Computer Security Act of 1987 and OMB Circular No. A-130 Revised (issued November 20, 2000), may require incumbents of certain public trust positions to undergo periodic reinvestigations. The appropriate level of any reinvestigation will be determined by the agency, but may be based on supplemental guidance provided by OPM.

(e) Risk level changes. If an employee experiences a change to a higher position risk level due to promotion, demotion, or reassignment, or the risk level of the employee's position is changed to a higher level, the employee may remain in or encumber the position. Any upgrade in the investigation required for the new risk level should be initiated within 14 calendar days after the promotion, demotion, reassignment or new designation of risk level is final.

(f) Completed investigations. Any suitability investigation completed by an agency under provisions of paragraph (d) of this section must result in a determination by the employing agency. The subject's employment status (i.e., applicant, appointee, or employee as defined in Sec. 731.101) will determine the applicable agency authority and procedures to be followed in any action taken.

[9] Plaintiff's Exhibit 14 and Defendant's Exhibit T.

[10] *Id.*

[11] *Id.*

[12] Plaintiff's Exhibit 7 and Defendant's Exhibit C.

[13] Plaintiff's Exhibit 8 and Defendant's Exhibit J.

[14] Plaintiff's Exhibit 9 and Defendant's Exhibit K.

[15] FED. R. CIV. P. 52(c) is made applicable to adversary proceedings under FED. R. BANKR. P. 7052. FED. R. CIV. P. 52(c) provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

[16] 28 U.S.C. § 157(c) (2012) provides:

> (1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.
> (2) Notwithstanding the provisions of paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

In accord with 28 U.S.C. § 157(c), to the extent that the Court would even be able to adjudicate this claim for relief, it would be limited to submitting only proposed findings of fact and conclusions of law.

[17] *In re Metro. Transp. Co.*, 64 B.R. 968, 975 (Bankr. E.D. Pa. 1986) (noting the plaintiff must make a prima facie case under Section 525(a) that requires the plaintiff to be a debtor that has been denied a government benefit to which he was qualified).

[18] 11 U.S.C. § 525(a).

[19] *In re Metro Transp. Co.*, 64 B.R. at 975.

[20] Bold and italics added. The remaining portions of 11 U.S.C. § 525 state:

> (b) No private employer may terminate the employment of, or discriminate with respect to employment against, an individual who is or has been a debtor under this title, a debtor or bankrupt under the Bankruptcy Act, or an individual associated with such debtor or bankrupt, solely because such debtor or bankrupt—
> (1) is or has been a debtor under this title or a debtor or bankrupt under the Bankruptcy Act;
> (2) has been insolvent before the commencement of a case under this title or during the case but before the grant or denial of a discharge; or
> (3) has not paid a debt that is dischargeable in a case under this title or that was discharged under the Bankruptcy Act.
>
> (c)(1) A governmental unit that operates a student grant or loan program and a person engaged in a business that includes the making of loans guaranteed or insured under a student loan program may not deny a student grant, loan, loan guarantee, or loan insurance to a person that is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, or another person with whom the debtor or bankrupt has been associated, because the debtor or bankrupt is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of a case under this title or during the pendency of the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.
> (2) In this section, "student loan program" means any program operated under title IV of the Higher Education Act of 1965 or a similar program operated under State or local law.

These remaining portions are significant in this matter because many of the cited materials and arguments by the parties are related to 11 U.S.C. § 525(b).

[21] 537 U.S. 293, 123 S. Ct. 832, 154 L. Ed. 2d 863 (2003).

[22] *Id.* at 301–02.

[23] *Id.* at 301 (emphasis added).

[24] *Id.* at 301–02.

[25] Section 525(a) is original to the Bankruptcy Reform Act of 1978, which completely overhauled the Bankruptcy Act of 1898. The inclusion of Section 525(a) in the 1978 act was in response to *Perez v. Campbell*—

18

Section 525(a) codifies its result. 402 U.S. 637, 91 S. Ct. 1704, 29 L. Ed. 2d 233 (1971). In enacting Section 525(a), Congress explained:

> This section is not so broad as a comparable section proposed by the Bankruptcy Commission, S. 236, 94th Cong., 1st Sess. Sec. 4-508 (1975), which would have extended the prohibition to any discrimination, even by private parties. Nevertheless, it is not limiting either, as noted. The courts will continue to mark the contours of the antidiscrimination provision in pursuit of sound bankruptcy policy.

H.R. REP. NO. 95-595, at 367 (1977); S. REP. NO. 95-989, at 81 (1978).

[26] *Saunders v. Reeher (In re Saunders)*, 105 B.R. 781, 788 (Bankr. E.D. Pa. 1989) ("Section 525(a) instead was intended to reach non-creditor governmental (or quasi-governmental) entities that, in their quest to protect the public interest, wrongfully discriminate against debtors and frustrate the 'fresh start' policy of the bankruptcy code by denying property interests not obtainable through the private sector.").

[27] *Nextwave*, 537 U.S. at 301–02.

[28] *McKibben v. Titus Cnty. Appraisal Dist. (In re McKibben)*, 233 B.R. 378, 381 (Bankr. E.D. Tx. 1999).

[29] *In re Metro Transp. Co.*, 64 B.R. at 968; *Parker v. Contractors State License Bd.*, 187 Cal. App. 3d 205 (1986).

[30] DHS expressly raised the issue of sovereign immunity in its Motion for Summary Judgment (see Docket #66) and at trial.

[31] *See, e.g., United States v. Lee*, 106 U.S. 196, 205, 1 S. Ct. 240, 27 L. Ed. 171 (1882).

[32] *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472, 123 S. Ct. 1126, 155 L. Ed. 2d 40 (2003).

[33] *See* 11 U.S.C. § 106.

[34] *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992).

[35] *See* 11 U.S.C. § 106(a)(3) ("The court may issue against a government unit an order, process, or judgment . . . including an order or judgment awarding money damages.").

[36] 11 U.S.C. § 106(a)(1)–(2).

[37] *Franklin Savings Corp. v. FDIC (In re Franklin Savings Corp.)*, 385 F.3d 1279, 1290 (10th Cir. 2004) (emphasis added).

[38] *Id.* at 1289.

[39] Emphasis added.

[40] Plaintiff's Exhibit 9 and Defendant's Exhibit K.

[41] *Id.*

---

[42] *See* Plaintiff's Exhibits 12 and 16 (showing more extensive information was given to DHS upon Plaintiff's appeal of the unsuitability determination).